UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Frenzy Technologies, Inc. d/b/a Hyper.co, <br><br> Plaintiff, <br><br> -against- <br><br> Frosted, Inc. d/b/a Whop.com, <br><br> Defendant. | Civil Action No.   22-cv-1223 <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Frenzy Technologies, Inc. d/b/a Hyper.co ("Hyper"), by and through its undersigned counsel, for their complaint against Frosted, Inc. d/b/a Whop.com ("Whop"), alleges as follows:

### INTRODUCTION

1. Hyper and Whop both offer tools for companies and content creators to accept payments for goods or services made available through online communities. But while their products are similar, their business practices are polar opposites. Hyper was built the old-fashioned way through sweat and innovation. Whop's product, on the other hand, was built on a foundation of hacking and deceit.

2. In particular, and as described further below, Whop started life as a marketplace for renting out automated "bots" that consumers could hire to try to cut the line to buy limited edition products. But Whop apparently decided that the "bot" business wasn't profitable enough and that it would be better off copying Hyper's business. To do this, Whop first entered into talks to "sell" its business (which was ethically challenged and worthless) and its engineers (which had value) to Hyper. Hyper alleges, however, that after an opportunity for discovery,

Hyper will be able to show that these talks were simply a pretext for Whop to pump Hyper for information about its business. Indeed, after the parties reached an oral agreement on a multimillion-dollar purchase price, Whop backed out of the deal with little explanation, claiming they had gotten "cold feet."

3. Hyper alleges that, after an opportunity for discovery, it will be able to show that Whop used what it learned from its discussions with Hyper to build a copycat product. Once it had an initial version of this product, Whop went to Hyper's customers and offered to provide the copycat product to them *for free* on the condition that the customers give Whop administrative access to the customer's account with Hyper. To hide this scheme, Whop created and registered pretextual email addresses that did not have any obvious ties to Whop—such as solesniper1@gmail.com. Whop then used this administrative access to deploy automated tools, also known as "scraping," to take information from Hyper's systems in *direct* violation of Hyper's Terms of Service. After an opportunity for reasonable discovery, we also expect the evidence to show that Whop used the information it gained from this nefarious activity to refine its products and to target other Hyper customers.

4. But not all of the Hyper customers that Whop approached were willing to go along with what was obviously an unethical and illegal scheme, and a few of them reported Whop's behavior to Hyper late last year. Armed with this information, Hyper's engineers were able to track down the digital signs left by Whop's intrusions and detect at least one of the phony email addresses.

5. While Hyper would have been justified to just sue at this point, it responded in a measured way. In particular, Hyper's lawyers wrote to Whop and demanded that Whop cease accessing Hyper's systems, stop violating Hyper's Terms of Service, and come clean about what

it had done.  Whop did none of this; it denied the allegations and then *continued* to access and scrape Hyper's system without remorse.

6. Whop has, therefore, shown itself to be a completely unethical organization whose underhanded business practices must be stopped.  Hyper therefore brings this suit to stop Whop's wrongful behavior and to recover the millions of dollars in damage that Whop's misconduct has caused.  To that end, Hyper seeks (1) an order of this Court enjoining Whop's unlawful behavior, (2) an accounting of and recovery of all information taken from Hyper through Whop's unlawful conduct, (3) ownership through a constructive trust of any and all aspects of Whop's business that was achieved through benefits unjustly obtained from Hyper, and (4) monetary damages—including disgorgement of any and all profits or gains Whop achieved through its misconduct.

## THE PARTIES

7. Hyper is a Delaware corporation headquartered at 1543 Alma Street, Palo Alto, CA 94301.  Hyper is a financial technology company that provides services allowing entrepreneurs and business owners to monetize membership in online communities.  Hyper's technology is used by businesses that include product sales, music, art, and content-creation industries to create subscription-based participation models for customers and fans.

8. Whop is a Delaware corporation headquartered at 1460 Broadway, Apt: 2, New York, NY 10036.  Whop's original business is an automated peer-to-peer rental service for "sneaker bots," which are computer programs that allow renters to make automated purchases of high-demand athletic sneakers on their release date.  More recently, Whop has introduced a product called "Whop Business" that replicates Hyper's business using unlawful and unfair means, as described below.

**JURISDICTION & VENUE**

9. This Court has subject-matter jurisdiction over Hyper's federal Computer Fraud & Abuse Act Claim pursuant to 28 U.S.C. § 1331. This Court has subject-matter jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal claim that they are part of the same case or controversy under Article III of the United States Constitution.

10. The Court has personal jurisdiction over Whop, and venue is appropriate in this District, including pursuant to 28 U.S.C. § 1391(b), because Whop resides in this District, does business in this District, is headquartered in this District, and a substantial part of the events giving rise to Hyper's claims against Whop arise out of Whop's conduct in this District.

**STATEMENT OF FACTS**

**I.    Hyper's Business.**

11. Hyper provides software and services that allow communities, developers, and solo entrepreneurs to accept payments for digital products, with a particular focus on online community communication platforms like Discord.[1] Hyper's product provides customers with everything they need to launch a business, including a hosted checkout page and integrations with third-party communication platforms. Hyper's software and services can be used to sell community memberships, software, physical products, and content. Thousands of communities and startups use Hyper to generate millions of dollars in revenue every month.

**II.   Hyper's Relationship With Whop.**

12. Hyper's relationship with Whop goes back to Whop's founding. When Whop

---

[1] Discord is an electronic communication platform that allows companies like Hyper to create a members-only communication group.

first launched into the market, it offered a marketplace where individuals could list their "sneaker bots" for rent. The primary use case at the time (and largely to this day) is for bots that are designed to purchase highly sought-after retail products that are likely to sell out at the moment of launch (e.g., popular limited-run athletic sneakers) far more quickly than a human being could make the purchase alone. At the time Whop was founded, Hyper's founder provided support to Whop's founders and helped them apply for funding through a well-known startup incubator.

13. In July 2021, Whop's management reached out to Hyper's management to inquire about a potential product collaboration. Whop proposed developing an online community powered by Hyper that could be used by Whop's users to manage assets related to bots posted on Whop's marketplace. Talks progressed quickly, and the companies reached a handshake deal for Hyper to acquire Whop for millions of dollars. But Whop was not actually interested in an acquisition. Instead, Whop was developing and launching a product competitive to Hyper's in stealth mode, actively poaching Hyper's customers and using the discussions as a cover to gather information on Hyper's business and technology. Whop therefore backed out of the handshake deal at the last minute with little explanation.

**III.   Whop's Unlawful Conduct & Unfair Competition.**

14. Although Hyper values fair competition, that is not what occurred here. Instead, Whop decided to engage in a concerted campaign to obtain unauthorized and unlawful access to Hyper's product, surreptitiously and unlawfully collecting information and data from Hyper's product, cloning Hyper's product, and using unlawful and unauthorized access to Hyper's product to poach Hyper's customers. Whop's conduct violates the Computer Fraud & Abuse Act ("CFAA"), 18 U.S.C. § 1030, is unfair competition, constitutes tortious interference with contract, breached Whop's binding contractual obligations to Hyper as reflected in Hyper's terms of service (the "Terms of Service"), and unjustly enriched Whop at Hyper's expense.

15. After Hyper and Whop's acquisition discussions ended with Whop's sudden withdrawal, Whop unexpectedly launched a product that is directly competitive to and a virtual clone of Hyper's product. When Hyper first discovered some of Whop's improper actions, it expressly banned Whop from accessing Hyper's website and Discord server. A reasonable opportunity for further investigation or discovery is likely to establish that Whop copied Hyper's product in designing its own competitive product.

16. Not content with copying Hyper's product, Whop also obtained unauthorized access to Hyper's website and used its unauthorized access to scrape information from Hyper's customers' accounts. Whop reached out to various Hyper customers and promised them access to Whop's competitive service for free if they agreed to add Whop as a user to their Hyper account. In order to hide the fact that Whop was accessing Hyper's systems in this manner, Whop created one or more anonymous email addresses which did not use the name of any person at Whop or Whop's email domain. Whop used this unfair and blatantly deceptive practice to obtain access to multiple Hyper customer accounts in this manner. Once Whop obtained surreptitious access to Hyper's customers' accounts, it began collecting data from Hyper's website to use in competition against Hyper.

17. This conduct violated Hyper's Terms of Service. The Terms of Service state that users shall not, *inter alia*, "modify, reproduce, distribute, scrape, frame or create derivatives of any part of the Services or Site Content" or "reverse engineer, disassemble, or decompile" any part of Hyper's product. Hyper's logs show that accounts associated with Whop logged into and accessed Hyper's product in a manner that can only be explained through the use of automated means, i.e., scraping, to access Hyper's site and retrieve data. The logs show that requests from Whop to Hyper's servers occurred within a second of one another or sometimes within

hundredths of a second of one another. Such rapid-fire access is inconsistent with human access, and it is impossible for a human user to generate requests with such frequency. Whop used the scraped data to compete with Hyper. A reasonable opportunity for investigation and discovery is likely to show that Whop was using scraped data from Hyper's site to inform its own product design, and that Whop designed its scraping software by reverse engineering Hyper's API in further violation of the Terms of Service.

18.     Upon discovering Whop's unauthorized and unlawful access to Hyper's product and servers, Hyper's counsel sent Whop a letter on October 21, 2021, demanding that it cease and desist accessing Hyper's website. Hyper informed Whop that surreptitious access to Hyper's product and website in order to scrape data was a violation of the Terms of Service and constituted multiple violations of law, including the CFAA, unfair competition law, and tortious interference with contractual relationships. Hyper further informed Whop that it was "revoking all authorization, express or implied, for Whop or anyone acting at Whop's direction to access Hyper's system in any way." Hyper further informed Whop that it was prohibited from accessing Hyper's website in any manner, particularly those portions protected by a password login requirement, and that any "prior, present, or future access to Hyper's website or systems by Whop is without authorization from Hyper."

19.     Whop received the letter and responded via counsel that it did not intend to access Hyper's website in the future.

20.     Notwithstanding Hyper's express revocation of Whop's permission to access Hyper's product and website on October 21, 2021, Whop again accessed Hyper's website on December 5, 2021. An account associated with Whop logged into the password-protected area of Hyper's website and again scraped data from Hyper's systems in knowing violation of the

Terms of Service and knowing violation of the CFAA.

21. Among other things, Whop used the scraped data to interfere with Hyper's contractual relations with its customers. Whop pitched its competing product to Hyper's customers at no fee, and if a customer expressed interest, Whop promised them that Whop would use unauthorized access to Hyper's website to export the customer's data. Whop was aware of the contractual relationship between Hyper and its customers. Hyper has a process by which any customer can request an export of its data—a process that (among other things) gives Hyper an opportunity to know that the customer has requested its data and to compete to retain the customer's business. But Whop circumvented that process and used unauthorized access to Hyper's website to scrape customer data without Hyper's permission and in direct violation of the Terms of Service. Whop further made material misrepresentations to Hyper's customers regarding the features and capabilities of Hyper's service. By unlawfully circumventing Hyper's customer data export process, Whop deprived Hyper of the opportunity to correct Whop's misstatements with customers and Hyper accordingly lost business due to Whop's misconduct.

### IV. Whop's Unlawful Activities Caused Harm To Hyper And Will Cause Harm If Allowed To Continue.

22. Hyper has been harmed by Whop's unauthorized access to Hyper's systems in an amount that exceeds $5,000, including, (1) the costs of employee time to investigate, uncover, and document the scope of Whop's unauthorized access, (2) the costs of employee time to investigate, categorize, and assess damage or potential damage caused by Whop's unauthorized access, including to assess damage caused by attempts to reverse engineer portions of Hyper's systems, and (3) the costs of Hyper's counsel's assistance with the investigation into damage caused by Whop's unauthorized access to Hyper's computer systems.

23. Hyper has been harmed by lost business caused by Whop's conduct, including

lost customer revenues from customers that Whop poached by virtue of accessing Hyper's computer systems without permission and marketing costs incurred to attempt to win back poached clients' business. Several customer accounts to which Whop obtained unauthorized access switched from Hyper to Whop, including, without limitation, Hyper's Flipd, ChefCooks, Card World, and Carbon customer accounts. While harming Hyper, Whop has been unjustly enriched by the same misconduct. Whop used information and data stolen from Hyper to gain market share, attract new customers, and build out its business.

24. Hyper has also been and will continue to be irreparably harmed due to Whop's misconduct. Whop has caused and will continue to cause harm to Hyper's customer goodwill. By using unauthorized access to and making misrepresentations about Hyper's service, Whop is damaging Hyper's reputation and goodwill with customers and potential customers. Further, Whop's conduct is decreasing Hyper's market share and will impact not only Hyper's revenues with respect to specific lost customers but also by a reduction in overall market share on a forward-looking basis if Whop's misconduct is allowed to continue. Moreover, if Whop is allowed continued access to Hyper's systems without restriction, it will be able to access and use Hyper's confidential information, including by reverse engineering Hyper's systems to discover Hyper's trade secrets, causing the loss of confidential status for such information. These harms to Hyper will be difficult, if not impossible, to quantify and repair through an award of money damages.

## CAUSES OF ACTION

### COUNT I
(Violation of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030)

25. Hyper realleges and incorporates by reference all of the preceding paragraphs.

26. Hyper's computers and servers are involved in interstate and foreign commerce

and communication and are protected computers under 18 U.S.C. § 1030(e)(2).

27. Whop knowingly and intentionally accessed Hyper's computers and servers without authorization or in excess of authorizations, including areas behind a login/password barrier, and obtained information from Hyper's computers and services. Hyper also explicitly revoked Whop's authorization to access Hyper's computers and servers, including on October 21, 2021.

28. Hyper has suffered damage and loss by reason of these violations, including, without limitation, the costs associated with investigating damage to Hyper's computers and servers associated with Whop's unauthorized access, and other losses and damage in an amount to be proven at trial, in excess of $5,000 aggregated over a one-year period.

29. In addition, Hyper has suffered and will continue to suffer irreparable harm, and its remedy at law is not itself adequate to compensate it for injuries inflicted by Whop. Accordingly, Hyper is entitled to injunctive relief.

**COUNT II**
(Breach of Contract—Pennsylvania Common Law)

30. Hyper realleges and incorporates by reference all of the preceding paragraphs.

31. Use of Hyper's website and web-based products are governed by and subject to the Terms of Service.

32. At all relevant times, Hyper prominently displayed a link to the Terms of Service on its homepage. At all relevant times, users logging into the password-protected areas of Hyper's website and products were informed of and consented to the Terms of Service at the point of login. Those who use Hyper's website with actual knowledge of the Terms of Service are required to abide by the Terms of Service if they access or use Hyper's website or products. Whop consented to the Terms of Service through officers or employees who had Hyper accounts

on multiple occasions.

33. The Terms of Service contain a Pennsylvania choice-of-law provision for all claims arising out of the Terms of Service and/or use of Hyper's website and products.

34. The Terms of Service prohibit scraping Hyper's website and products.

35. The Terms of Service prohibit reverse engineering any part of Hyper's website and products.

36. After being bound by the Terms of Service, Whop repeatedly accessed the Hyper website and Hyper's products and scraped data in ways that violate and breach the Terms of Service. A reasonable opportunity for discovery will show that Whop reverse engineered some or all of Hyper's website in order to build its automated scraping software.

37. Hyper has performed all conditions, covenants, and promises required of it in accordance with the Terms of Service.

38. Whop's conduct has damaged Hyper and caused, and continues to cause, irreparable harm and injury to Hyper. Hyper is entitled to injunctive relief, compensatory damages, and/or other equitable relief.

**COUNT III**
(Intentional Interference With Contractual Relations—Pennsylvania Common Law)

39. Hyper realleges and incorporates by reference all of the preceding paragraphs.

40. Hyper maintained contractual relationships with multiple customers, relationships which were known to Whop.

41. Whop contacted those customers of Hyper and, by making promises of "free" services and making untrue claims regarding the features of Hyper's products, induced such customers to provide Whop access to Hyper's password-protected website and products. Use of

such website and products is governed by the Terms of Service, which contain a Pennsylvania choice-of-law provision.

42. Whop used its access, which it knew to be unauthorized, to scrape data from Hyper's website and products in violation of the Terms of Service. Whop then used that data to induce Hyper's customers to transition to Whop's competing product.

43. Whop possessed no privilege or justification for its conduct.

44. Whop's conduct has damaged Hyper and caused, and continues to cause, irreparable harm and injury to Hyper. Hyper is entitled to injunctive relief, compensatory damages, and/or other equitable relief.

## COUNT IV
(Unfair Competition—Pennsylvania Common Law)

45. Hyper realleges and incorporates by reference all of the preceding paragraphs.

46. Hyper and Whop are in direct competition with one another as they provide, at least in part, similar products and services.

47. Whop engaged in unfair competition against Hyper by, *inter alia*, (1) tortiously interfering with Hyper's contractual relations with customers, (2) accessing Hyper's website under false pretense and without authorization, (3) scraping information and data in violation of the Terms of Service and using it to compete against Hyper, and (4) making misrepresentations about the quality and nature of Hyper's products.

48. Whop engaged in unfair competition through use of Hyper's website and products. Such use is governed by the Terms of Service, which contain a Pennsylvania choice-of-law provision.

49. Whop's conduct has damaged Hyper and caused, and continues to cause,

irreparable harm and injury to Hyper.  Hyper is entitled to injunctive relief, compensatory damages, and/or other equitable relief.

## COUNT V
(Unjust Enrichment/Constructive Trust—Pennsylvania Common Law)

50. Hyper realleges and incorporates by reference all of the preceding paragraphs.

51. Whop obtained benefits in the form of information and data unlawfully scraped from Hyper's website and products.

52. Whop appreciated the benefits associated with its unlawful acquisition of information and data from Hyper's website and products by leveraging the information and data in support of its own business and product.

53. It would be inequitable for Whop to retain the benefits of its unlawful conduct without compensation to Hyper for what was taken.

54. The information and data was unlawfully scraped by Whop from Hyper's website and is subject to a constructive trust such that Hyper maintains the true beneficial interest in the information and data, it would be inequitable for Whop to retain any benefits associated with the information and data, and Hyper is therefore entitled to recover all profits, gains, or benefits realized by Whop arising from such unlawfully acquired information and data or anything else of value obtained by Whop through the unlawful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Hyper prays that judgment be entered in its favor and against Whop, as follows:

1. A permanent injunction enjoining and restraining Whop, its employees, representatives, agents, and all persons or entities acting in concert with it prior to, during, and after the pendency of this action perpetually from:  (a) accessing or using Hyper's website,

servers, or products, and any data displayed or stored therein and (b) using data or information extracted from Hyper's website, servers, or products for any purposes whatsoever.

2. An order requiring Whop to return all documents, data, and other items, electronic or otherwise, that were wrongfully extracted from Hyper's website, servers, or products.

3. An award to Hyper of damages, including, but not limited to, compensatory damages, profits of Whop, and/or punitive damages, as permitted by law, in an amount to be proven at trial;

4. A constructive trust over anything of value obtained by Whop through its misconduct such that all profits, gains, or benefits realized by Whop arising from such misconduct is disgorged and awarded to Hyper;

5. An award to Hyper of its costs of suit, including, but not limited to, reasonable attorneys' fees, as permitted by law; and

6. Such other relief as the Court deems just and proper.

## JURY DEMAND

Hyper demands a trial by jury on all issues so triable.

Dated: New York, New York

February 14, 2022

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: */s/ Paige Pavone*
Paige Pavone
ppavone@orrick.com

51 West 52nd Street
New York, NY  10019-6142
+1 212 506 5000
+1 212 506 5151

Clement Seth Roberts
*Pro Hac Vice Forthcoming*
croberts@orrick.com
Nathan Shaffer
*Pro Hac Vice Forthcoming*
nshaffer@orrick.com
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
+1 415 773 5700

Attorneys for Plaintiff
Frenzy Technologies, Inc. d/b/a Hyper.co